# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | Arlander Keys |
|---|---|---|---|
| **CASE NUMBER** | 02 C 2171 | **DATE** | 6/7/2002 |
| **CASE TITLE** | Kraft Foods Holdings vs. Stuart Helm | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Memorandum Opinion and Order entered. Plaintiff's Motion for Preliminary Injunction [#5-6] is granted. Status hearing set for 6/21/02 at 9:00 a.m. *AK*

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| ✓ | Copy to judge/magistrate judge. | |

FT/*Pesy*  courtroom deputy's initials

4
number of notices

JUN 0 7 2002
date docketed

*alv*
docketing deputy initials

6/7/2002
date mailed notice

FT
mailing deputy initials

U.S. DISTRICT COURT
CLERK
02 JUN -7 AM 8:27

Date/time received in central Clerk's Office

Document Number

*22*

KRAFT FOODS HOLDINGS, INC.,          )
a Delaware corporation               )
                                     )
         Plaintiff,                  )
                                     )      Case No.   02 C 2171
              v.                     )
                                     )      Judge Ronald Guzman
STUART HELM a/k/a                    )
"KING VELVEEDA,"                     )
                                     )      Magistrate Judge Arlander Keys
         Defendant.                  )

### MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Plaintiff's Motion for a Preliminary Injunction. For the reasons set forth below, the Court grants Plaintiff's motion.

### BACKGROUND

The plaintiff, Kraft Foods Holdings, Inc. ("Kraft"), is the manufacturer and distributor of Velveeta® brand cheese products. (Oglesby Aff. ¶ 3). Kraft has owned the Velveeta® trademark since 1923. (Pl.'s Mem. Supp. Prelim. Inj., Ex. 1A).[1] Revenue from sales of Velveeta® brand cheese products have exceeded 3 billion dollars since the early 1990's, and Kraft has sold more than 1 billion pounds of the cheese products in that same period of time. (Oglesby Aff. ¶ 3). Kraft has extensively advertised, marketed and

---

[1]  Kraft owns several registered trademarks of the "Velveeta" name. The first trademark application was filed with the United States Patent and Trademark Office in 1923, and the latest was filed in 1996. (Pl.'s Mem. Supp. Prelim. Inj., Ex. 1, A).

promoted its Velveeta® brand cheese products in the United States
and worldwide for years through a variety of mediums, including
print, radio, television and the Internet. (Oglesby Aff. ¶ 3; Tr.
at 41). Some Velveeta® commercials date back to 1949. (Pl.'s
Suppl. Ex, Ex. 9-12). In the last decade, Kraft has spent more
than 100 million dollars in advertising Velveeta® brand cheese
products alone. (Oglesby Aff. ¶ 3). In any given year, almost one
in four households in the United States use Velveeta® brand cheese
products. (Pl.'s Suppl. Ex., Ex. 8). Kraft markets Velveeta® brand
cheese products to the public, including families with children.
(Oglesby Aff. ¶ 7).

The Defendant, Stuart Helm, calls himself "King VelVeeda" and
operates a website at www.cheesygraphics.com and built the website
and provided the content for www.courtofporn.com. (Helm Dep. at 20-
21). Mr. Helm has inserted the word "VelVeeda" into his website as
a metatag or metaname so that individuals looking for him on the
Internet need only type "VelVeeda" into an Internet search engine
to find his website. (Tr. at 125-126). The top page of the
www.cheesygraphics.com website has the omnipresent banner reading
"King VelVeeda's Cheesygraphics.com."[2] (Helm Dep. at 19-20). Mr.
Helm testified that "King VelVeeda" is his nickname and that he has
been using it for approximately 17 years to identify himself,

---

[2] The banner at the top of Mr. Helm's website currently
reads "King VelVeeder's Cheesygraphics.com." (Helm Dep. at 107).

including to sign his artwork. (Helm Dep. at 8-9; Def.'s Resp. ¶ 7). Mr. Helm uses the name "King VelVeeda" throughout the aforementioned websites to identify the particular content as belonging or referring to him. (Helm Dep. at 8, 23; Pl.'s Mem. Supp. Prelim. Inj., Ex. 2A, 2B, 2C). Mr. Helm testified that he uses his website in order for people to contact him, to give him ideas and to "hire [him] for art, sure." (Tr. at 144).

Both websites contain photographs, drawings and other material of an admittedly adult nature, which is geared toward "mature audiences." (Def.'s Suppl. Resp. at 1). Mr. Helm's website contains various photographs and illustrations of nude women and women in various stages of undress, striking sexually suggestive poses. (Pl.'s Mem. Supp. Prelim. Inj., Ex. 2B, 2E). Some illustrations also depict women and men engaging in sexual activity, including bestiality. (Pl.'s Suppl. Ex., Ex. 16, 20, 23, 25). Mr. Helm's website also contains references to, and illustrations of, drug use and paraphernalia. (Pl.'s Mem. Supp. Prelim. Inj., Ex. 2A). The websites also contain links to other web pages containing photographs of nude or semi-nude women in sexually suggestive poses. (Pl.'s Suppl. Ex., Ex. 22). Mr. Helm's website contains various references to "cheese" or "cheesiness;" for example, there are links on his website for purchasing "Cheesy Merch[andise]," for viewing photographs of nude or semi-nude women, entitled "extra cheese," or for signing the "cheesy guestbook,"

3

(Pl.'s Mem. Supp. Prelim. Inj., Ex. 2B).

Mr. Helm designs the artwork on a variety of merchandise, including tee-shirts, coffee mugs and custom artwork, which he then makes available for sale on his website. (Helm Dep. at 38). Mr. Helm also offers his design services to the public, including web, graphic and print design. (Pl.'s Mem. Supp. Prelim. Inj., Ex. 2B, 2C). The www.cheesygraphics.com homepage contains the following six links at the top of the page: "Free Comics," "Art Gallery," "Cheesy Merch[andise}," "Portfolio," "Picture of the Day Archives" and "Binky's Linky Dinks." (Pl.'s Mem. Supp. Prelim. Inj., Ex. 2A). The links "Art Gallery," "Cheesy Merch[andise]" and "Portfolio" all provide merchandise or services for sale to the public. (Helm Dep. at 64-68.) Mr. Helm testified that he has sold items from his website to individuals outside of Illinois. (Helm Dep. at 88). One of the items Mr. Helm designed and sells on his website is a comic book called "VelVeeda SINGLES and Seconds." (Pl.'s Mem. Supp. Prelim. Inj., Ex. 2F).

Kraft learned of Mr. Helm's website and his use of the name "King VelVeeda," and in January 2002, an attorney for Kraft contacted Mr. Helm and asked him to cease using "VelVeeda" in his commercial activities. (Mandell Aff. ¶ 3). Mr. Helm refused, and Kraft notified Mr. Helm again and offered him a sixty day "transition" period in which he would gradually phase in a new name and then cease using "VelVeeda" altogether. (Pl.'s Mem. Supp.

4

Prelim. Inj., Ex. 3B).

After receiving no response from Mr. Helm, Kraft filed a Complaint and Request for Permanent Injunction against Mr. Helm on March 25, 2002.[3] Kraft alleges that Mr. Helm is tarnishing the Velveeta® trademark, in violation of the Federal Trademark Dilution Act of 1995 (the "Lanham Act") and the Illinois Trademark Registration and Protection Act (the "Illinois Anti-Dilution Act").[4] (Compl. ¶ 1). Kraft filed a Motion for Preliminary Injunction against Mr. Helm, which was subsequently referred to this Court for a report and recommendation by Judge Guzman. However, both parties consented to this Court to rule on the issue of a preliminary injunction pending the decision on the merits.

## DISCUSSION

A court will grant a preliminary injunction if the moving party proves that: (1) its case has some likelihood of success on the merits; (2) no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). If the moving party demonstrates all three of these elements, then the

---

[3] Judge Guzman is presiding over the merits of the underlying case and the issue of a permanent injunction and damages.

[4] The Court has subject matter jurisdiction over Kraft's federal law claim based on 15 U.S.C. § 1052 and 28 U.S.C. § 1331 and 1338(a). Further, the Court has supplemental jurisdiction over Kraft's state law claim pursuant to 28 U.S.C. § 1367(a) and 28 U.S.C. § 1338(b).

court "must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied." *Id.* The court should then consider the public interest in granting or denying the injunction. *Id.* Finally, the court sits as would a court of equity and weighs all of these factors in determining whether to grant the injunction. *Id.*

When First Amendment rights are at stake, an injunction must be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)(internal quotations and citations omitted). An injunction must be "tailored as precisely as possible to the exact needs of the case." *Carroll v. President and Comm'rs of Princess Anne*, 393 U.S. 175, 184 (1968).

## I. The Lanham Act[5]

### A. Likelihood of Success on the Merits

At the preliminary injunction stage, the plaintiff need only demonstrate that it has a "better than negligible" chance of success on the merits. *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988). Therefore, the first step the Court must take is to determine Kraft's

---

[5] The elements in finding dilution under the Illinois Anti-Dilution Act are almost identical to the elements required in the Lanham Act. Therefore, the Court will incorporate the Illinois Anti-Dilution Act in its analysis of the Lanham Act.

likelihood of success on the merits of its Complaint against Mr. Helm.

Section 43(c) of the Lanham Act entitles owners of famous trademarks to an injunction against third parties that are diluting the famous mark if the owner of the senior mark can prove the following: (1) the senior mark is famous; (2) the junior mark is being used in commerce and for commercial purposes; (3) the use of the junior mark began after the senior mark became famous; and (4) the junior mark causes dilution of the senior mark. 15 U.S.C. § 1125(c)(1998); *see Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 466 (7th Cir. 2000).

        1.   *Velveeta® is a famous mark.*

The Lanham Act provides the following factors which courts may use to determine whether a mark is famous:

> (a) the degree of inherent or acquired distinctiveness of the mark;
>
> (b) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;
>
> (c) the duration and extent of advertising and publicity of the mark;
>
> (d) the geographical extent of the trading area in which the mark is used;
>
> (e) the channels of trade for the goods or services with

7

which the mark is used;

(f) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(g) the nature and extent of use of the same or similar marks by third parties; and

(h) whether the mark was registered under the Act of March 3, 1881 or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(1998).

In accordance with the Lanham Act, the "strongest protection is reserved for fanciful marks that are purely the product of imagination and have no logical association with the product." *Eli Lilly*, 233 F.3d at 466. A trademark that is "distinctive, arbitrary, fanciful or coined" rather than "generic or descriptive" falls under this category, because it is inherently distinctive. *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1033 (2nd Cir. 1989)(internal citations omitted); *see also Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 727 (7th Cir. 1998). A trademark acquires a secondary meaning and is entitled to protection when that mark specifically identifies and distinguishes one company's goods or services from those of its competitors. *Platinum*, 149 F.3d at 727.

Kraft first registered the name "Velveeta®" in 1923, and has

8

spent millions of dollars advertising, marketing and promoting its product through television, radio, print and Internet advertising. Further, revenue from sales of Velveeta® brand cheese products have reached billions of dollars, and one in four households have Velveeta® products in their home at any given time. Mr. Helm conceded Velveeta®'s ubiquitousness when he was asked to recall whether he was aware of a product called Velveeta® when he first adopted his nickname "King VelVeeda;" he answered that Kraft was engaging in a "massive advertising campaign" and that he must have been aware of the name Velveeta® at that time. (Helm Dep. at 9).

Mr. Helm posits that the word "velveeta" has developed an alternate meaning in the English language, and therefore, is generic and has not acquired a protectable secondary meaning. (Def.'s Suppl. Resp. at 6). Mr. Helm asserts that the word "velveeta" is used on the Internet and describes a spam-type message. (Def.'s Suppl. Resp. at 6). The Court does not find Mr. Helm's argument convincing. While some Internet users may refer to excess message postings as spam or "velveeta," this niche group does not negate the strength of Kraft's Velveeta® trademark with the general public. Velveeta®, like Polaroid®,[6] Coca-Cola®[7] and

---

[6] *See Polaroid Corp. v. Polaraid, Inc.*, 319 F.2d 830 (7th Cir. 1963).

[7] *See Coca-Cola v. Gemini Rising, Inc.*, 346 F. Supp. 1183 (E.D.N.Y. 1972).

Kodak®[8] are coined words in the English language that conjure up nothing less than images of the respective products associated with each mark. Therefore, the Court finds that Velveeta® is a famous mark.

### 2. *Mr. Helm is using the words "King VelVeeda" in commerce for commercial purposes.*

The United States Supreme Court has held that courts must construe the phrase "in commerce" liberally, because the Lanham Act "confers broad jurisdictional powers upon the courts of the United States." *Steele v. Bulova Watch Co.*, 344 U.S. 280, 283 (1952). A person's "use of the Internet satisfies the 'in commerce' requirement of Section 43(c)." *Intermatic, Inc. v. Toeppen*, 947 F. Supp. 1227, 1239 (N.D. Ill. 1996). The "in commerce requirement would be met in a typical Internet message, be it trademark infringement or false advertising." *Id.* (quoting 1 GILSON, TRADEMARK PROTECTION AND PRACTICE, § 5.11(2),at 5-234 (1996)).

Mr. Helm admitted that he has sold merchandise on his website, www.cheesygraphics.com to individuals outside of Illinois and that he continues to offer his products and services for sale. Mr. Helm also testified that he signs his artwork as "King VelVeeda" and uses that name to identify himself, his artwork and various merchandise and services showcased on his website on the Internet. Given Mr. Helm's own admissions, Kraft has clearly met the

---

[8] *See Eastman Kodak Co. v. Rakow*, 739 F. Supp. 116 (W.D.N.Y. 1989).

requirement showing Mr. Helm's commercial use of the name "King VelVeeda" in commerce.

Mr. Helm argues that he also provides commentary and free displays of artwork on his website, and therefore, his use of the name "King VelVeeda" can hardly be categorized as "propos[ing] a commercial transaction."[9] (Def.'s Suppl. Resp. at 9). Mr. Helm understates the predominance of his activities that propose a commercial transaction. While it is true that Mr. Helm has non-commercial content on his website, three of the six links that display prominently at the top of his homepage offer his merchandise or services for sale. The Court is unconvinced that commerce does not encompass a significant portion of Mr. Helm's website. Further, given the broad scope set forth by the Supreme Court in construing the term "in commerce" in association with the Lanham Act, Mr. Helm's arguments must fail.

### 3. Mr. Helm adopted the name "King VelVeeda" after Velveeta® became famous.

Kraft first registered its Velveeta® trademark in 1923. Mr. Helm began calling himself "King VelVeeda" in approximately 1985, when, as he testified, the name "King VelVeeda" just "popped into

---

[9] Additionally, Mr. Helm contends that his commercial use of the name "VelVeeda" is "inextricably intertwined" with his constitutionally protected right of free speech, and therefore, should be given greater protection. (Def.'s Suppl. Resp. at 8-9). The Court will address later in this Opinion, Mr. Helm's First Amendment argument, including his contention that the name "King VelVeeda" is a parody and deserves heightened protection.

[his] head." (Helm Dep. at 8). Mr. Helm began using the name "King VelVeeda" on his website approximately 12 years ago. (Helm Dep. at 12).

The record establishes that Mr. Helm adopted the name "King VelVeeda" after Velveeta® became famous. Mr. Helm practically conceded this fact when he said that he was aware of Kraft's massive marketing campaign for Velveeta® during the time the name "King VelVeeda" popped into his head. Kraft had been advertising Velveeta® for more than 60 years, and started running television commercials for its cheese products back in 1949. The Court finds it unlikely that Mr. Helm came up with the nickname "King VelVeeda" independent of any knowledge of Kraft's Velveeta® brand cheese products. Whether "VelVeeda" has any connection to Velveeta® is for the trier of fact to determine. At this stage of the proceedings, Kraft has shown that it is likely that Mr. Helm's choice of the word "VelVeeda" was deliberate in order to bring to mind Velveeta®. Therefore, the Court finds that Mr. Helm adopted the name "King VelVeeda" after Velveeta® became famous.

### 4. *The "King VelVeeda" name dilutes Velveeta®.*

Section 45 of the Lanham Act defines "dilution" as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of competition between [the marks] or likelihood of confusion . . . ." 15 U.S.C. § 1127(1998). The Seventh Circuit

has held that "proof of a mere 'likelihood of dilution' is sufficient to satisfy the 'causes dilution' element. . . ." *Eli Lilly*, 233 F.3d at 468.

Dilution can occur by blurring or tarnishment.[10] *See id.* at 466. Dilution by tarnishment occurs when "a junior marks's similarity to a famous mark causes consumers to mistakenly associate the famous mark with the defendant's inferior or offensive product." *Id.* Further, with tarnishment, the positive associations that the public once had for plaintiff's product have been "corroded" and have decreased the mark's value. See MCCARTHY, TRADEMARKS AND UNFAIR COMPETITION § 24:95. Tarnishment is often found when the senior mark is placed in the context of sexual activity, obscenity or illegal activity. *See, e.g. Eastman Kodak*, 739 F. Supp. 116; *Dallas Cowboy Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 467 F. Supp. 366 (S.D.N.Y.), *aff'd*, 604 F.2d 200 (2d Cir. 1979); *Pillsbury Co. v. Milky Way Prods., Inc.*, 215 U.S.P.Q. (BNA) 124 (N.D. Ga. 1981).

In evaluating the similarity of two trademarks, "if one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements." *Ty*, 237 F.3d at 898 (citing *Henri's Food Prods. Co. v. Kraft, Inc.*, 717 F.2d 352, 356 (7th Cir. 1983)). The court held

---

[10] Kraft's allegations against Mr. Helm constitute a dilution by tarnishment claim. Therefore, the Court will not discuss the issue of dilution by blurring.

that plaintiff's and defendant's mark were similar and that defendant infringed on plaintiff's mark. In *Ty*, the plaintiff and the defendant were both manufacturers of plush toys – plaintiff's toy was called "Beanie Baby" and defendant's toy was called "Beanie Racer." *See Ty*, 237 F.3d at 898. However, certain parts of the hanging name tag were different, such as the shape, color and wording. *Id.* at 899. The court found that "the term 'Beanie' is salient and reduces the importance of the surrounding elements." *Id.* The court held that the "Beanie" mark was the common thread among all of Ty's products. *Id.*

In a trademark infringement and dilution by blurring case, the Seventh Circuit held that the words "Herbrozac" and "Prozac" were similar enough in spelling and pronunciation to cause a likelihood of confusion. *See Eli Lilly*, 233 F.3d at 462. The prefix 'herb" was added to the junior mark and the "p" was replaced with a "b." *Id.* The defendant claimed that the spelling and the pronunciation were, therefore, dissimilar. *Id.* The court was not convinced and held that the marks were "strikingly similar." *Id.* The court held that "slight variations in spelling or arrangement of letters are often insufficient to direct the buyer's attention to the distinction between the marks." *Id.* (internal quotations and citations omitted).

The name "VelVeeda" is strikingly similar to the name Velveeta®. Similar to the facts in the *Eli Lilly* case, both

"VelVeeda" and Velveeta® are pronounced the same and are spelled the same, except that the second "v" in "VelVeeda" is capitalized and Mr. Helm uses a "d" in his mark instead of a "t."

Mr. Helm argues that the marks are not similar, and that, therefore, he is not diluting Kraft's mark. (Def.'s Suppl. Resp. at 5). Mr. Helm points out that he uses the word "King" at all times with "VelVeeda," the "a" is frequently inverted, the "font, size, color, placement and word angle" are different, and he uses a "three-pronged gold crown" with a "V" inside the crown in association with his nickname. (Def.'s Suppl. Resp. at 5). The Court has examined the exhibits displaying Mr. Helm's website and takes judicial notice that the inverted "a" appears only once (Def.'s Ex. B) and that, at all other times in the exhibits, the "a" remains in a normal position.

The Court finds that the salient portion of the Velveeta® trademark is the word "Velveeta®" itself – not the font, size, color or placement of the mark. Nor is the fact that Mr. Helm occasionally inverts the "a" in "VelVeeda" or places his crown insignia near his nickname crucial to the determination of similarity. The Court gives these surrounding elements much less weight, because it is the distinctiveness of the name itself that gives Velveeta® its protected status. As the Court noted above, the pronunciation and spelling of "VelVeeda" and Velveeta® are similar. Further, Velveeta® and "VelVeeda" is the "common thread"

15

for both Kraft and Mr. Helm's respective marks.   Therefore, the Court concludes that the marks are sufficiently similar.

Finally, the Court must determine whether "VelVeeda" tarnishes the brand name Velveeta®, in order to satisfy the second element of a dilution by tarnishment claim.  This case is similar to the facts of the cases where tarnishment has been found in the context of sexual activity and illegal activity.[11]  The content of Mr. Helm's website and the www.courtofporn.com website is of an admittedly adult nature.  It depicts graphic sexuality and nudity, as well as illustrations of drug use and drug paraphernalia.   These images conflict with the image that Kraft has successfully cultivated for more than 79 years as a wholesome, family-oriented product.   The two similar marks would cause consumers to associate Velveeta® with Mr. Helm's arguably offensive product, thereby tarnishing the Velveeta® mark.   Further, Mr. Helm's use of "VelVeeda" corrodes Kraft's mark, because the association of Velveeta® with "VelVeeda" likely causes the former to lose the reputation and goodwill that it once had.   Thus, the Court finds that, given the graphic, sexually explicit nature of the website and the illustrations of illegal drug use, the "VelVeeda" mark likely tarnishes Velveeta®.

Kraft has satisfied the first element of a preliminary injunction claim – likelihood of success on the merits.  Kraft has

---

[11] The Court is not making any determinations as to whether the content of Mr. Helm's website is obscene or not.   That issue is not currently before the Court.

16

provided ample evidence which shows that it has more than a negligible chance of proving its dilution claims against Mr. Helm under the Lanham Act. The Court now turns to the remaining elements for the granting of a preliminary injunction.

### B. **Kraft Has No Adequate Remedy At Law**

Dilution of a trademark is "remarkably difficult to convert into damages." *Hyatt Corp. v. Hyatt Legal Srvcs.*, 736 F.2d 1153, 1158 (7th Cir. 1984). Damages caused by dilution are insidious, because courts find it "impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations." *Abbott Labs v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992); *see also Ty*, 237 F.3d at 902.

Kraft has demonstrated that it has more than a negligible chance of success on the merits. Therefore, Kraft's loss of goodwill or reputation caused by Mr. Helm's commercial use of the word "VelVeeda" is immeasurable.

### C. **Kraft Will Suffer Irreparable Harm If A Preliminary Injunction Is Not Granted**.

Preliminary injunctions are granted in cases of dilution, because "dilution is an infection which, if allowed to spread, will inevitably destroy the advertising value of the mark." *Polaroid Corp. v. Polaraid Inc.*, 319 F.2d 830, 836 (7th Cir. 1963); *see, e.g., Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v.*

17

*Celozzi-Ettelson Chevrolet, Inc.*, 855 F.2d 480, 484 (7th Cir. 1988); *Hyatt*, 736 F.2d at 1158. The standard in the Seventh Circuit is to presume irreparable harm in cases of dilution. *See Eli Lilly*, 233 F.3d at 469.

Kraft has satisfied the final element for the issuance of a preliminary injunction by showing that it will suffer irreparable harm if an injunction is not granted. The Court must now consider the harm that Mr. Helm will suffer if the preliminary injunction is granted, and then balance that harm against the irreparable harm that Kraft will suffer if such relief is denied.

**D.   Balancing The Harms Favors Kraft.**

The balancing of harms analysis incorporates a "sliding scale approach;" the more likely the plaintiff will succeed on the merits, the less the balance of harms need favor the plaintiff. *Ty*, 237 F.3d at 895. In *Ty*, the court held that the district court did not abuse its discretion when it held that the balance of harms favored the plaintiff in a trademark infringement case. *Id.* at 904. The defendant "conceded that it had full knowledge of plaintiff's trademark prior to adopting its mark." *Id.* In its analysis of the balance of harms, the district court excluded the burden defendant "voluntarily assumed by proceeding in the face of a known risk." *Id.*

The *Ty* court concurred with the district court's finding that defendant could not now claim that he would suffer economic harm

after knowingly adopting an already registered and famous trademark. *Id.* at 903. The district court found no evidence that an injunction against defendant would "put [defendant] out of business." *Id.* The court found that the irreparable harm suffered by plaintiff, and that it would continue to suffer if the injunction was not granted, outweighed defendant's harm. *Id.* The court reasoned that "plaintiff could lose control of its reputation and goodwill . . . and would risk losing years of nurturing its business." *Id.*

The Court finds that the Seventh Circuit's observation that a party "entering a field already occupied by another has a duty to select a trademark that will avoid confusion" also applies to dilution claims, given the fact that dilution and trademark confusion (where likelihood of confusion is an element) are two different types of dilution. *See Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979).

Although *Ty* was a trademark infringement case, the facts supporting the *Ty* court's balance of harms analysis is similar to the facts in the case before this Court. Again, Mr. Helm admitted that he had knowledge of the Velveeta® mark at the time that he adopted his nickname, "King VelVeeda." The Court finds it extremely unlikely that Mr. Helm chose the name "VelVeeda" without any thought to Kraft's Velveeta®, as Mr. Helm contends. Especially convincing to the Court is Mr. Helm's use of the word "cheese," and

19

derivatives thereof, appearing on his website, given that Kraft markets Velveeta® as a cheese product.

Also damning to Mr. Helm's case is the title for a comic book designed by Mr. Helm called "VelVeeda SINGLES and Seconds," which is remarkably similar to two Kraft products, Kraft Singles® and Velveeta Slices®. Mr. Helm had knowledge of Velveeta®'s existence, and, therefore, he had a duty to select another name for himself, but chose to use "VelVeeda." Mr. Helm chose this name at his own peril, including the risk of an action for dilution being brought against him.

Further, Mr. Helm testified that he would suffer no economic harm if he were enjoined from using the name "VelVeeda." He changed the heading on the top of his navigation page, which now substitutes the letters "er" for the final letter "a" in VelVeeda. He testified that the name VelVeeda has "no effect" on his website, and that people would still be able to access his website and purchase his goods and services, even if he ceased calling himself "VelVeeda." (Tr. at 108-109). Mr. Helm also testified that the name "VelVeeda" plays no role in the sales of his goods and services, and that the artwork, and not his name, sells itself. (Trans. 124-125). Finally, Mr. Helm testified that it would be financially burdensome to alter his website and to recall all the artwork he has sold in order to remove his name from the items. (Tr. at 122).

The Court finds that Mr. Helm, by his own admission, has not proven that he will suffer irreparable harm if the injunction is granted. He will still be able to sell his art, post his art on his website and do everything he has done before. Certainly, the balance of harms shifts in favor of Kraft in this case. The Court is sympathetic to the fact that it would cost Mr. Helm approximately two weeks worth of his income, which he estimates to be approximately $250 per week, to remove all references to "VelVeeda" from his website. (Tr. at 122). However, given the evidence showing little, if any, harm to Mr. Helm and the fact that he had prior knowledge of the Velveeta® name and Kraft products, including Kraft Singles® and Velveeta Slices®, Mr. Helm assumed the risk of an injunction being entered against him. Therefore, the Court finds that the balance of harms favors Kraft.

### E.  **The Public Will Not Suffer Harm If The Court Grants Kraft A Preliminary Injunction**.

The *Eli Lilly* court held that "the public interest is served by [granting] a preliminary injunction because enforcement of the trademark laws prevents consumer confusion." 233 F.3d at 469. The Seventh Circuit's reasoning extends to the other branch of the Act – dilution. The facts that this Court used in its balance of harms analysis are similar for the facts used in the analysis of the public's interest.

After Mr. Helm is enjoined from using the name "VelVeeda," his fans, as well as the general public, will still be able to visit

his website, view and purchase his artwork and otherwise engage in other commercial activities with him. The only change is that the public will no longer see any references to "VelVeeda" on his website or on his artwork. Also, individuals seeking to purchase Mr. Helm's artwork or to hire him for services will no longer be able to find him on the Internet by typing "VelVeeda" into an Internet search engine. However, given Mr. Helm's testimony, his nickname is not important in order do any of the above.

Kraft has shown that it is entitled to a preliminary injunction. However, Mr. Helm raises two affirmative defenses:[12] First Amendment protection and laches, which the Court will now address.

## II. First Amendment Freedom of Speech Protection

Mr. Helm denies diluting the Velveeta® brand. However, he claims that even if he is found to be diluting Kraft's mark, the protections afforded to individuals under the First Amendment protect him from a preliminary injunction. First, Mr. Helm asserts

---

[12] In Mr. Helm's Supplemental Response, he asserts that this case should be stayed until the United States Supreme Court renders its decision in *V Secret Catalogue, Inc. v. Moseley*, 259 F.3d 464 (6th Cir. 2001), *cert. granted, Moseley v. V Secret Catalogue, Inc.*, 122 S. Ct. 1536 (April 15, 2002). The Seventh Circuit provided a thorough analysis of the two prevailing views dividing the circuits in dilution cases and chose to follow the Second Circuit. Therefore, in the Seventh Circuit, a "mere likelihood" of confusion, not actual confusion, is necessary to satisfy the "causes dilution" element. The *Eli Lilly* decision is the law in this circuit, and this Court will not and cannot speculate as to how the Supreme Court will rule on the *V Secret* case or whether the High Court will overrule *Eli Lilly*.

that "VelVeeda" is a parody of Velveeta®, and, therefore, is protected under the First Amendment. (Def.'s Suppl. Resp. at 10). Next, Mr. Helm asserts that his use of the "VelVeeda" name on the Internet and in connection with his writing and design work are "inextricably intertwined" with his commercial use of the name "Velveeda," and, therefore, should give him heightened free speech protection. (Def.'s Suppl. Resp. at 8-9).

In his filings, Mr. Helm claims that his use of the name "King VelVeeda" is a parody and is entitled to heightened protection. The Seventh Circuit has defined parody as "a humorous or satirical imitation of a work of art that 'creates a new art work that makes ridiculous the style and expression of the original.'" *Eli Lilly*, 233 F.3d at 463 (citing *Rogers. v. Koons*, 960 F.2d 301, 309-10 (2nd Cir. 1992). In his Supplemental Response, Mr. Helm's claim that his use of "VelVeeda" is a parody of Kraft (Def.'s Suppl. Resp. at 10-11) contradicts his statements in both his deposition and in his in-court testimony that his use of "VelVeeda" is not meant to be an opinion, commentary or parody of Kraft or Velveeta®. (Helm Dep. at 99-101; Tr. at 144-145).

Both parties cite a variety of cases to support their respective claims concerning the parody issue. *See Dr. Seuss Enters. L.P. v. Penguin Books,* 109 F.3d 1394, 1403 (9th Cir. 1997) (a parodist's poem about the O.J. Simpson murder trial, entitled <u>The Cat NOT in the Hat! A Parody by Dr. Juice</u>, was an infringement

of <u>The Cat in the Hat</u>, by Dr. Seuss.); *Eveready Battery Co. v. Adolph Coors Co.*, 765 F. Supp. 440, (N.D. Ill. 1991); *Hormel Foods Corp. v. Jim Henson Prods.*, 73 F.3d 497 (2nd Cir. 1996)(puppet character named "Spa'am" is a harmless parody and does not infringe on the Spam lunch meat); *Jordache Enters. V. Hogg Wyld, Ltd.*, 625 F. Supp. 48, *aff'd* 828 F.2d 1482 (10th Cir. 1987)(court found no dilution of Jordache mark by maker of Lardashe jeans); *Nike, Inc. v. "Just Did It" Enters.*, 6 F.3d 1225 (7th Cir. 1993)(court of appeals held that lower court abused its discretion in granting summary judgment finding infringement, because trier of fact could find that parody existed and was not infringing); *Dallas Cowboy Cheerleaders*, 604 F.2d 200(plaintiff's cheerleading outfits were trademarks that defendant diluted by its use of plaintiff's mark in pornographic film); *Original Appalachian Artworks, Inc. v. Topps Chewing Gum*, 642 F. Supp. 1031(N.D. Ga. 1986)(defendant's unsavory and noxious "Garbage Pail Kids" products infringed mark of "Cabbage Patch Kids"); *Coca-Cola v. Gemini Rising, Inc.*, 346 F. Supp 1183(E.D.N.Y. 1972)("Enjoy Cocaine" logo similar to Coca-Cola's mark diluted plaintiff's "wholesome" product and would injure plaintiff's business reputation); *General Electric Co. v. Alumpa Coal Co.*, 205 U.S.P.Q. (BNA) 1036 (D. Mass. 1979)("Genital Electric" monogram on underpants and T-shirts injured plaintiff's trademark.)

The cases cited by Mr. Helm to support his contention that

24

parodies of famous marks should not be enjoined are distinguishable. The junior marks in *Hormel*, *Jordache* and *Everready*, did not involve explicit sexual or illegal activities. The respective courts found the parodies in each case to be harmless, obvious jokes, parodying the original product. Further, the *Nike*[13] case, decided in this Circuit, involved trademark infringement, and, therefore, the court used a likelihood of confusion analysis, which is inappropriate for dilution cases. Also, the *Nike* defendant's use of "Just Did It" hardly comes under the same category as "Enjoy Cocaine" or "Genital Electric," and therefore, is distinguishable from the facts in the case before this Court.

Mr. Helm's website contains items of a sexually explicit nature and illustrations of illegal drug paraphernalia and drug use. Finally, and perhaps most fatal to Mr. Helm's claim that he is parodying Velveeta® and should be protected, are his admissions to the contrary. He stated twice that he never parodied Kraft or Velveeta® and that his use of the name "VelVeeda" is not a parody of the Kraft cheese products. Thus, the Court concludes that "VelVeeda" is not a parody of Velveeta,® and this portion of Mr.

---

[13] Mr. Helm mischaracterizes the finding of the *Nike* court. In that case, the Seventh Circuit held that the lower court erred in granting the plaintiff summary judgment. *Nike*, 6 F.3d at 1233. The court found that an issue of fact existed as to whether the junior mark was a valid parody of the senior mark, and that, therefore, summary judgment was inappropriate at that time. *Id.* at 1232.

Helm's First Amendment defense fails.

Next, Mr. Helm argues that his use of the word "VelVeeda" for commercial purposes is "inextricably intertwined" with his use of "VelVeeda" in non-commercial speech, and therefore, an injunction would be erroneous. He cites the United States Supreme Court's decision in *Riley v. National Fed'n of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988) to support his position. (Def.'s Suppl. Resp. at 8-9).

The United States Supreme Court has held that traditional political or social speech receives greater protection than commercial speech. *See, e.g., San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee*, 483 U.S. 522 (1987). Trademark rights need not "yield to the exercise of First Amendment rights under circumstances where adequate alternative avenues of communication exist." *Dallas Cowboy Cheerleaders*, 604 F.2d at 206 (quoting *Lloyd Corp. v. Tanner*, 407 U.S. 551, 567 (1972)). Further, a First Amendment defense fails "where the trademark functions to connote the source of the product or message, rather than being used in a communicative message." *Brach van Houten Holding, Inc. v. Save Brach's Coalition for Chicago*, 856 F. Supp 472, 476 (N.D. Ill. 1994).

In *Riley*, the Supreme Court held that, where "the component parts of a single speech are inextricably intertwined . . ." courts must apply the test for fully protected speech. *Riley*, 487 U.S. at

26

796. *Riley* involved a state law concerning solicitation of funds for charitable purposes. *Id.* at 784. The Court had previously ruled that "charitable solicitations involve a variety of speech interests," and, therefore, invoke some First Amendment protections. *Id.* at 788 (internal quotations and citations omitted).

The *Riley* Court found that the state law at issue regulated both fully protected speech and commercial speech. *Id.* at 788-89. The Supreme Court held that "[r]egulation of a solicitation 'must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech . . . and for the reality that without solicitation the flow of such information and advocacy would likely cease.'" *Id.* at 796 (quoting *Schaumburg v. Citizens for a Better Environ.*, 444 US. 620, 632 (1980)). The Supreme Court held that commercial speech does not "retain[s] its commercial character when it is inextricably intertwined with otherwise fully protected speech," and therefore, the Supreme Court applied its heightened free speech standard to the law relating to the solicitation of funds for charitable purposes. *Riley,* 487 U.S. at 796.

However, the Supreme Court distinguished its holding in *Riley* in its later decision in *Board of Trustees of the State Univ. of New York v. Fox*, 492 U.S. 469 (1989). In *Fox*, the college prohibited commercial enterprises from taking place on campus,

including so-called "tupperware parties" in dormitories. *Id.* at
471-72.   The students holding these parties alleged that the
parties not only served a commercial purpose but "also touch on
other subjects, however, such as how to be financially responsible
and how to run an efficient home." *Id.* at 473-74.   The Supreme
Court held that the protected speech was not inextricably
intertwined with the commercial purpose of selling housewares,
because:

> no law of man or of nature makes it impossible to sell
> housewares without teaching home economics, or to teach
> home economics without selling housewares.   Nothing in
> the resolution prevents the speaker from conveying, or
> the audience from hearing, these noncommercial messages,
> and nothing in the nature of things requires them to be
> combined with commercial messages.

*Id.* at 474.     Justice Scalia, writing for the majority,
distinguished the facts in *Riley* from the facts in *Fox*, because the
regulation in *Riley* required the commercial speech to be included
with the fully protected speech, and was, therefore, inextricably
intertwined. *See Fox*, 492 U.S. at 474.   However, in *Fox*, Justice
Scalia determined that the resolution did not prevent the students
from exercising their freedom of expression – they were only
prohibited from engaging in commercial activities in their
dormitories.   *Id.*   The Supreme Court held that the non-commercial

aspects of the "tupperware" presentations were not inextricably intertwined with the prohibited, commercial aspects, and therefore, did not deserve the Supreme Court's heightened scrutiny. *Id.* at 474-75.

Mr. Helm uses the name "King VelVeeda" as a nickname and to identify his artwork and services as belonging to him. Mr. Helm admits that he does not need the name "King VelVeeda" to write political or social commentary, because "VelVeeda" is the source and not the object of his commentary. (Tr. at 168). Further, Mr. Helm concedes that his website is not about free speech, and he has never used the name "VelVeeda" in any parody or commentary. (Tr. at 120, 127). Mr. Helm did not reveal any examples of his commentary – political or social, that he allegedly posts on his website, save for the drawing of a giant noodle, which he has posted on his website since the filing of the instant lawsuit.

Similar to the facts in *Fox*, and, therefore, unlike the facts in *Riley*, the portion of Mr. Helm's website that is non-commercial is not inextricably intertwined with the commercial portions of the website. As noted above, Mr. Helm's website serves the purpose of selling his artwork and his services. However, Mr. Helm's website also provides free art for viewing and contains other non-commercial entertainment. As noted above, Mr. Helm admitted that his use of the name "VelVeeda" is unnecessary to sell or display his art or to post commentary. The Court concludes that "no law of

man or of nature makes it impossible" for Mr. Helm to exercise his free speech rights after the Court issues a preliminary injunction against him.

An injunction ordering Mr. Helm to discontinue using the word "VelVeeda" in his commercial endeavors would not prevent him from displaying art, writing commentary or engaging in other protected free speech activities. Thus, Mr. Helm's use of the name "King VelVeeda" to sell his wares in a commercial endeavor is not inextricably intertwined with his fully protected free speech rights, and therefore, is not entitled to the heightened scrutiny that Mr. Helm requests.

## III. **Kraft is not barred by laches in bringing this suit**.

In order to succeed with a laches affirmative defense, the defendant must show that the plaintiff did not move with "reasonable promptness" to enjoin defendant's use of the trademark and that the delay harms defendant. *See Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 222 (7th Cir. 1999). However, "[l]aches will not bar injunctive relief where a defendant adopted the trade name with knowledge of a plaintiff's rights [in the trade name] . . . ." *Ameritech, Inc. v. American Info. Techs. Corp.*, 811 F.2d 960, 963 (6th Cir. 1987).

Mr. Helm raises an interesting point when he asserts that he has been using the name "King VelVeeda" for 17 years and only now is being asked by Kraft to cease. (Def.'s Suppl. Resp. at 3).

However, the law on the application of laches is clear. Mr. Helm has not submitted any evidence showing that Kraft had knowledge of Mr. Helm's use of the name "VelVeeda." Mr. Helm speculates that Kraft employs a "small army of employees whose sole job it is to detect possible trademark infringement." (Def.'s Suppl. Resp. at 11). However, Mr. Helm cites nothing in the record to prove his claim, nor does the Court find that such evidence of an "army" would be dispositive in finding laches. Thus, Mr. Helm's affirmative defense of laches fails.

## CONCLUSION

Kraft has shown that (1) it has a likelihood of success on the merits of its dilution case against Mr. Helm, (2) no adequate remedy at law exists, and (3) Kraft will suffer irreparable harm if the preliminary injunction is not granted. Kraft also established that Mr. Helm's use of the name "VelVeeda" in his commercial endeavors is likely to dilute by tarnishment the Velveeta® trademark, in violation of the Lanham Act and the Illinois Anti-Dilution Act. After balancing the harms between Mr. Helm and Kraft, and assessing the harm that would incur to the public if the injunction is not granted, the Court concludes that a preliminary injunction is proper.

**IT IS THEREFORE ORDERED** that Mr. Helm, his agents, servants, employees, attorneys, successors and all those in active concert or participation with him, are hereby enjoined, pending a final

decision in this matter, from using all references to "VelVeeda," (regardless of the capitalization of the letters), in any commercial manner or activity, including on Mr. Helm's websites and any other websites on which Mr. Helm is authorized to post or create web pages. Mr. Helm shall also remove all references to "VelVeeda," and variations thereof, from any metatags, metanames or any other keywords on his websites, effective immediately. The Court orders Mr. Helm to appear before the Court at 9:00 AM on June 21, 2002, to confirm that he is complying with this Order.

In the event that Mr. Helm is found to have been wrongfully enjoined, Mr. Helm is entitled to security for the payment of any costs or damages suffered by him. Mr. Helm's testimony as to the relatively small amount of money he earns from his sales and services, as well as the modest costs needed to comply with this injunction, lead this Court to hereby order Kraft to post a bond, made payable to the Clerk of the Court, in the amount of $10,000.00 no later than June 21, 2002.


DATED: June 7, 2002                    ENTER:

                                       _____
                                       ARLANDER KEYS
                                       United States Magistrate Judge


32